## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## <u>JACKSONVILLE DIVISION</u>

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| BEREAN BAPTIST CHURCH OF ORANGE PARK, INC.[1], a Florida corporation, | ) ) ) | Case No.:  10-bk-4791 Chapter 11 |
| Debtor. | ) | |
| _____ | ) | |

## <u>DISCLOSURE STATEMENT</u>

Bradley R. Markey, Esq.
**Stutsman Thames & Markey, P.A.**
50 North Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 (Facsimile)

Attorneys for Berean Baptist Church of Orange Park, Inc.

---

[1] The tax identification number of the Debtor is 59-1588812.   The address of the principal office of the Debtor is 4459 Highway 17 South, Orange Park, Florida 32203.

-1-

## Introduction

This Disclosure Statement is submitted by Berean Baptist Church of Orange Park, Inc., a Florida not-for-profit corporation ("Berean" or "Debtor"), pursuant to § 1125 of the Bankruptcy Code.  The purpose of this Disclosure Statement is to provide holders of claims against the Debtor with sufficient information to make an informed judgment of whether to accept or reject the Plan of Reorganization (the "Plan") which Berean has filed with this Court.  The Disclosure Statement should be read in conjunction with the Plan.

To the extent this Disclosure Statement contains financial information, it was prepared from information provided by Debtor.  Debtor has made every attempt to provide reliable and accurate financial information; however, such information has not been subject to an independent certified audit to insure absolute accuracy.

The description of the Plan contained in this Disclosure Statement is intended as a summary only and is qualified in its entirety by reference to the Plan itself.  Except as otherwise expressly provided herein, capitalized terms used herein and defined in the Plan shall have the same meaning attributed to them in the Plan.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified herein, and delivery of this Disclosure Statement shall not create an implication that there has been no change in the facts set forth herein since the date of this Disclosure Statement and the date the materials relied upon in preparation of this Disclosure Statement were compiled.

This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan, and nothing contained herein shall constitute an admission of fact or liability by any party, or be admissible in any proceeding involving the debtor or any other party, or be deemed conclusive advice on the tax or other legal effects of the reorganization on holders of claims or interests.

THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION, IS BEING ASKED TO APPROVE THIS DISCLOSURE STATEMENT, WHICH APPROVAL WOULD NOT CONSTITUTE A DETERMINATION ON THE MERITS OF THE PLAN. APPROVAL OF THE DISCLOSURE STATEMENT MEANS THAT THE BANKRUPTCY COURT HAS FOUND THAT THE DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION TO PERMIT CREDITORS AND EQUITY INTEREST HOLDERS OF DEBTOR TO MAKE A REASONABLY INFORMED DECISION IN EXERCISING THEIR RIGHT TO VOTE UPON THE PLAN.

THIS DISCLOSURE STATEMENT, TOGETHER WITH THE PLAN, SHOULD BE READ IN ITS ENTIRETY.    ADDITIONALLY, IT MAY BE

ADVISABLE FOR CREDITORS AND EQUITY SECURITY HOLDERS TO CONSULT THEIR OWN COUNSEL OR OTHER ADVISORS WITH RESPECT TO THE MATTERS CONTAINED HEREIN.

NO REPRESENTATIONS CONCERNING BEREAN OR THE PLAN, OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT, HAVE BEEN AUTHORIZED BY BEREAN OR THE BANKRUPTCY COURT.

## Overview of Chapter 11

Once a petition for reorganization is filed, actions to collect prepetition debts are stayed, and other contractual obligations may not be enforced. These protections give debtors the opportunity to restructure their operations under court supervision and guarantee that all creditors will receive fair and equitable treatment. After the commencement date, debtors are given the opportunity to restructure their operations and may obtain credit, sell assets, and reject executory contracts and lease obligations, subject to court approval. Debtors may then propose a plan of reorganization to restructure their obligations. Substantially all liabilities of a debtor as of a commencement date are subject to settlement under a plan of reorganization and are to be voted upon by all impaired classes of creditors and interest holders and approved by a bankruptcy court. The approval of a plan of reorganization allows a debtor to emerge from bankruptcy and to continue operating its business without continued court supervision.

## Voting and Acceptance

Following approval of this Disclosure Statement, the bankruptcy court will schedule a hearing to consider confirmation and approval of the Plan. Notice of that hearing will be provided to you, along with a copy of the Plan, this Disclosure Statement and a ballot for you to either accept or reject the Plan.

Under the Bankruptcy Code, not all creditors of the Debtor are entitled to cast a vote to accept or reject the Plan. Only holders of claims that are "impaired" may vote. However, any creditor or party in interest may appear at the confirmation hearing on the Plan and be heard by the court in support or opposition to the Plan, provided that parties opposing confirmation shall have timely filed an objection in writing with the bankruptcy court.

Under the Bankruptcy Code, a class of claims or interests is considered to have accepted the Plan if both a majority in number and two-thirds (2/3) of the dollar amount of those actually voting from that class vote to accept the Plan. The claims of those who do not vote are not counted in determining whether the requisite statutory majority in

-3-

number and dollar amount have voted for acceptance.    Acceptance by the statutory majority, however, will bind the minority who vote to reject the Plan.    Pursuant to § 1129(b) of the Bankruptcy Code, the Plan may also be confirmed and become binding on creditors and parties in interest notwithstanding the rejection of the Plan by a class of creditors or interest holders if the Court finds that the Plan does not "discriminate unfairly" and is "fair and equitable" to such class in accordance with the provisions of § 1129(b).

IF YOU DO NOT VOTE, and no impaired Class accepts the Plan, the bankruptcy court may permit the secured creditors of Berean to enforce their rights in their collateral, which may in turn result in the non-payment of unsecured claims.

The information set forth herein is intended to help you arrive at a decision to either accept or reject the Plan.

### The Debtor

Berean is an independent Baptist church ministering to some 450 members from its facilities at 4459 Highway 17 South in Orange Park, Florida (the "Church Property"). Berean was established in 1988 and is a not-for-profit corporation duly organized in Florida.    Prior to 1988, Berean was known as Clay Baptist Temple.    In addition to its worship services, Berean provides a number of other ministries including    Sunday School, Nursery, Youth and Kids Klub, Outreach Ministry, Bus Ministry, Public School Ministry, Deaf Ministry, Spanish Ministry, Christian Ladies Fellowship, Nursing Home Ministry, Bible Classes, Music Ministry and a Summer Youth Basketball League. Berean is also involved in a number of outreach programs.

Berean has, since 1982, operated a Christian academy from its campus in Orange Park.    The academy offers kindergarten through twelfth grade classes and currently has approximately 120 students who are, in most cases, the children of church members.

Since August 1998, the Berean Baptist College has also operated from the church campus.    The college has a current enrollment of 50 students who live in on-campus dormitories.    Berean Baptist College, Inc., a non-debtor affiliate, owns the college.

Berean has 37 employees.    Students of the academy and college are served by a faculty consisting of 9 full-time and 10 part-time professors and teachers from various backgrounds.    For the years ended December 31, 2008 and 2009, Berean had revenues of approximately $2 million and $1.8 million, respectfully.    Approximately 66% of those revenues represent funds contributed by Berean's members in the form of general offerings.    Revenues from the academy (17%) and the college (17%) make up the remaining 34% of overall revenues.    Year-to-date revenues for 2010 are approximately $1.75 million.

## Debt Structure

Berean owns the Church Property from which it operates its church and the academy. The college also operates from the Church Property. The campus consists of 459,122 square feet (10.54 acres). The church campus consists of a main sanctuary building, an educational building, two dormitory and classroom buildings, a gymnasium with additional classrooms, and a single-family residence converted into a dormitory.

The Church Property is subject to a mortgage in favor of First Bank which secures a note obligation in the principle amount of $5.7 million. That loan originated as the result of a refinancing transaction in June 2008. The most recent appraisal of the property completed at the request of First Bank in May 2010, valued the property at $8.3 million.

Berean has equipment leases with Apple, Inc. and Modular Space Corporation. Apple provides computers used by the church, academy and college. Modular Space provides modular units used as classrooms and dormitories. The church is also party to a number of vehicle leases and financing arrangements for vehicles used by the church, the academy and certain of its employees.

As of the petition date, Berean owed $97,940.10 to its employees for work performed through June 2, 2010. Berean is current on its post-petition payroll and sales tax obligations.

## Events Leading to the Chapter 11 Case

Berean's financial problems began in 1998 when it issued bonds to refinance its original mortgage on the Church Property, construct a dormitory facility and a gymnasium building. Additional space was needed so that the church could increase membership and the academy and college could increase enrollment and upgrade facilities to attract new students. Construction began in June 2001. The new buildings were completed and began being used in January 2002. Within a few months, toxic mold was discovered in the new dormitory. Time consuming and expensive remediation efforts were not successful. Concerns over mold intrusion forced closure of the building in June 2002 and led to costly and drawn out litigation against contractors. Ultimately, the building had to be demolished, and the costs associated with the construction were never recovered.

The current economic recession has also impacted the church's membership. Many Berean members have lost employment and are therefore unable to contribute or have been forced to reduce tithing. Enrollment at the academy and college is down as the costs of education have increased.

On December 11, 2009, First Bank filed foreclosure proceedings in *First Bank v. Berean Baptist Church of Orange Park, Inc. a/k/a Berean Baptist Church*; Circuit Court, Fourth Judicial Circuit, Clay County, Florida; Case No.: 09-CA-338. A judgment of foreclosure was entered on April 5, 2010. The foreclosure sale date was set for June 4, 2010. Foreclosure of the Church Property would cripple Berean's operations, leaving 450 members without a place to worship, 165 students without a school and 37 individuals unemployed. Additionally, both Apple Computer and Modular Space were threatening to repossess equipment leased by Berean and critical to church and academy operations.

On June 2, 2010 (the "Petition Date"), Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code.

### Historical Operating Results

Historically, Berean operated profitably. The situation reversed itself beginning in 2002 with the problems associated with the newly constructed dormitory facility and gymnasium. Likewise, Berean's finances have also been significantly impacted by the economic downturn. The historical performance of the company is set forth below:

| Year | Gross Revenues |
|------|----------------|
| 2008 | $2,023,667.30 |
| 2009 | $1,812,382.13 |
| 2010 (year-to-date) | $1,746,028.15 |

### Events During the Chapter 11 Case

1. **Management.**

Pursuant to 11 U.S.C. § 1108, Berean has continued to operate its property and business affairs as a debtor-in-possession. No trustee has been appointed. The company is managed by its President and the Chairman of the Board of Trustees, Dr. Thomas Neal. Dr. Neal has served as pastor at Berean since 1980.

2.    **Professionals.**

The following professionals have been employed by Berean during the pendency of this reorganization:

Stutsman Thames & Markey, P.A., a Jacksonville, Florida based firm, has been employed as Berean's bankruptcy counsel.    The primary lawyers involved in the reorganization are Richard R. Thames, a board certified business bankruptcy specialist with over 22 years experience and Bradley R. Markey, who has over 16 years experience.

Stephen DuVal of DuVal Fields Consulting, LLC was employed as an independent financial accountant.    DuVal Fields has assisted the Debtor with the preparation and filing of its financial statements for the last 8 years, has provided services to the Debtor in the past and is currently assisting with company accounting, budgeting, as well as certain Chapter 11 reporting requirements.

All compensation payable to professionals employed pursuant to 11 U.S.C. § 327 is subject to bankruptcy court approval following proper application and notice of hearing.

3.    **Executory Contracts and Unexpired Leases.**

As of the Petition Date, Berean was party to the following executory contracts and unexpired leases:

| Lessor | Description |
|---|---|
| Apple, Inc. | Lease of various computer equipment |
| BMW Financial | Lease of 2008 BMW 528i; VIN: WBANU53518C114076 |
| Chrysler Financial | Lease of 2008 Dodge Caravan; VIN: 1D8HN54P28B147883 |
| Southland Waste Systems | Non-hazardous waste service agreement |
| Jerry D. Wright | Lease option to purchase agreement for mission house |
| Modular Space Corporation | Lease of four modular space units; Serial Nos.: 4205, 4206, 4207 and 4208 |
| Verizon Wireless | Cellular phone service provider |

In connection with its reorganization efforts, Berean intends to assume the Apple, Inc., Modular Space Corporation and Chrysler Financial leases and is negotiating with those lessors on an arrangement under which Berean will pay any past due, pre-petition arrearages. The lease with Jerry D. Wright and the contract with Verizon will likewise be assumed.

By order dated October 28, 2010, the Court entered an order granting Berean's motion to reject the Southland Waste Systems contract. That contract has been replaced with a new contract resulting in a savings of $500 per month for waste collection services.

By its terms, the lease of the BMW 528i (VIN: WBANV53518C114076) with BMW Financial expired in July 2010. The vehicle has been returned.

4.    **Claims Bar Date.**

October 12, 2010 (the "Claims Bar Date") was established as the deadline for filing proofs of claim for all creditors except governmental units. The claims bar date for governmental units is November 29, 2010. If a Claim was listed in the schedules as non-contingent, liquidated and undisputed, a Proof of Claim need not be filed. Creditors are responsible for examining the schedules to determine the necessity of filing a Proof of Claim. Creditors are advised to monitor the case for any amendments to the schedules which may impact the necessity of filing a proof of claim, as there may be amendments or objections being filed to eliminate some prepetition claims.

## The Plan

Berean has proposed a plan of reorganization to deal with the Debtor's debt burdens. The Plan contemplates the continuation of the Debtor's business as a going concern and will be funded through revenues generated in the ordinary course of business. The Plan is intended to ensure that all creditors receive as much or more than they would receive in a liquidation of the company without forcing the Church and academy to cease operations.

## Classification of Claims

The Plan classifies claims and interests separately in accordance with the provisions of the Bankruptcy Code, and provides different treatment for different classes of claims and interests. A summary of all claims and their classification is set forth below:

-8-

| Class | Class Type | Claimant | Claim Amount[2] |
|---|---|---|---|
| 1 | Admin. | Stutsman Thames & Markey, P.A. | $30,000.00[3] |
| | | Stephen DuVal, CPA | $7,500.00 |
| 2 | Priority | Past Due Wage Claims[4] | $98,772.20 |
| 3 | Priority | Internal Revenue Service | $10,343.55 |
| 4 | Secured | Bank of America (2008 BMW) | $44,810.55 |
| 5 | Secured | GMAC (2006 Impala) | $2,915.19 |
| 6 | Secured | GMAC (2006 Trailblazer) | $11,750.21 |
| 7 | Secured | Wachovia (2007 Silverado) | $12,937.02 |
| 8 | Secured | Wachovia (2006 Impala) | $2,829.53 |
| 9 | Secured | First Bank | $6,116,423.14 |
| 10 | Unsecured | Various | **$225,567.61** |
| 11 | Equity | N/A (not-for-profit) | |

## Purpose of the Plan

In formulating the Plan, the primary goal of the debtor was to find an acceptable way to repay creditors while maintaining an ongoing business. Berean has determined that a liquidation of Debtor's property would not be in the best interest of creditors and would in fact produce less for secured and unsecured creditors than would be achieved by the Plan.

BEREAN BELIEVES THAT THE PLAN AS NEGOTIATED AND PROPOSED PROVIDES THE GREATEST AND EARLIEST POSSIBLE DISTRIBUTIONS TO CREDITORS OF BEREAN. BEREAN THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF EACH CLASS OF CREDITORS AND INTEREST HOLDERS OF BEREAN AND RECOMMENDS THAT THEY VOTE TO ACCEPT THE PLAN.

---

[2] Reflects both scheduled claims and filed proofs of claim. Berean reserves the right to object to the amount or validity of any Claim and the listing of any Claim herein shall not be deemed to be an admission of any kind as to the validity or amount of any Claim.

[3] Estimated. Stutsman Thames & Markey received a prepetition retainer of $30,000 for services to be rendered in connection with this case. DuVal received a prepetition retainer of $4,000.

[4] See Attached Schedule E

## Summary of the Plan

**Class 1.**    **Administrative Claims.**  Administrative Claims, as defined under 11 U.S.C. § 507(a)(1) and as allowed under 11 U.S.C. § 503(b), will be paid in full within 30 days of the Effective Date, or as otherwise agreed between Debtor and the Administrative Claim holder(s).  Quarterly fees payable to the Office of the United States Trustee will be paid when due in the ordinary course through the entry of the Final Decree.

**Class 2.**    **Past Due Wage Claims (Priority Claim).**  As of the Petition Date, Debtor owed $98,772.20 in priority wages and salaries earned within 180 days of the Petition Date which claims will be paid in full within 30 days of the Effective Date, or as otherwise agreed between Debtor and the Priority Claim holder(s).

**Class 3.**    **Internal Revenue Service (Priority Claim).**  The IRS submitted a proof of claim indicating that Debtor owed $10,343.55 in WT-FICA employment taxes for the quarter ending June 30, 2010.   That amount has been paid in full by Debtor.

**Class 4.**    **Bank of America (2008 BMW).**  Bank of America's Allowed Secured Claim shall be paid in monthly installments of principal and interest amortized over 5 years with 6% interest.  Payments made during the pendency of the case will be credited towards the satisfaction of the Debtor's plan obligations.   Bank of America shall retain its lien until its Allowed Secured Claim is paid in full.

**Class 5.**    **GMAC (2006 Trail Blazer).**  GMAC's Allowed Secured Claim shall be paid in monthly installments of principal and interest amortized over 4 years with 6% interest.  Payments made during the pendency of the case will be credited towards the satisfaction of the Debtor's plan obligations.  GMAC shall retain its lien until its Allowed Secured Claim is paid in full.

**Class 6.**    **GMAC (2006 Impala).**  GMAC's Allowed Secured Claim shall be paid in monthly installments of principal and interest as provided in the original Financing Agreement.  Payments made during the pendency of the case will be credited towards the satisfaction of the Debtor's plan obligations.

**Class 7.**    **Wachovia (2007 Silverado).**    This vehicle was traded in post-petition.  No further amounts are due to Wachovia and no payments will be made under the Plan.

**Class 8.**    **Wachovia (2006 Impala).**  Wachovia's Allowed Secured Claim shall be paid in monthly installments of principal and interest as provided in the original Financing Agreement.  Payments made during the pendency of the case will be credited towards the satisfaction of the Debtor's plan obligations.

**Class 9.      First Bank.** First Bank holds a mortgage on Debtor's property located at 4459 Highway 17 South, Orange Park, Florida to secure a note obligation of approximately $6,116,423.14. First Bank's Allowed Secured Claim shall be paid as follows:  sixty (60) interest only monthly installments calculated at 3.5% interest and amortized over thirty (30) years with a balloon payment of the full amounts remaining due on month sixty-one (61).

**Class 10.      Unsecured Claims.** The Allowed Claims of Unsecured Creditors will share in a pro-rata distribution of twenty (20) quarterly distributions of $5,000 each commencing sixty (60) days form the Effective Date of the confirmation of a Plan of Reorganization and continuing on the fifteenth day of each quarter thereafter.

Unsecured creditors whose Claims are subject to dispute or objection shall receive no distribution until such objection or dispute is resolved by final order. The Debtor shall, however, reserve funds to make the proportionate distribution to such creditors until such time as all claims objections have been finally determined. All funds reserved on account of Disallowed Claims shall be distributed pro-rata to all other unsecured claims at the conclusion of the claims objection process.

Pursuant to 11 U.S.C. § 502(d), no payments shall be made to any entity from which property is recoverable under §§ 542, 543, 550 or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under §§ 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, unless such entity or transferee has paid the amount, or turned over any such property from which such entity or transferee is liable under §§ 522(i), 542, 543, 550 or 553 of the Bankruptcy Code. The Claim of any recipient of a payment avoidable under §§ 542, 543, 550 or 553 of the Bankruptcy Code who fails to pay or turnover the amount of the payment to the Debtor within 60 days of a judgment or order avoiding the transfer or requiring such turnover shall be extinguished and forever barred.

All Unsecured Claims of Insiders, if any, shall be subordinated to the payment of all other General Unsecured Claims.

**Class 11.      Equity Interests.** Debtor is a not-for-profit Florida corporation and does not have any equity holders.

## Means of Implementation

The Plan will be implemented and funded through the continued operation of Berean's business and from the continued collection of tithes and income from the academy. The restructuring of certain vehicle loans and the note on the Church premises

are expected to result in significant monthly cash flow savings, which in turn will improve the Debtor's prospects for successfully fulfilling its obligations under the Plan.

## Executory Contracts

On the Petition Date, Berean had the following executory contracts in process:

| Party | Job Description |
|---|---|
| Apple, Inc. | Lease of various computer equipment |
| BMW Financial | Lease of 2008 BMW 528i; VIN: WBANU53518C114076 |
| Chrysler Financial | Lease of 2008 Dodge Caravan; VIN: 1D8HN54P28B147883 |
| Southland Waste Systems | Non-hazardous waste service agreement |
| Jerry D. Wright | Lease option to purchase agreement for mission house |
| Modular Space Corporation | Lease of four modular space units; Serial Nos.: 4205, 4206, 4027 and 4208 |
| Verizon Wireless | Cellular phone service provider |

Debtor intends to assume the remaining contracts to the extent such contracts remain executory.

All executory contracts not assumed prior to the Confirmation Date will be rejected.

Any party to a contract or lease that claims damages from the rejection of such lease or contract must file a Claim for such damages within 30 days of (i) the rejection of such contract or lease; or (ii) confirmation of the Plan, whichever is earlier, or be forever barred from asserting such Claim. Any timely Allowed Rejection Claim shall be treated as a Class 11 Unsecured Claim.

-12-

**Expense Sharing Agreement between**
**Debtor and Berean Baptist College, Inc.**

Debtor has been sharing with its related company, Berean Baptist College, Inc. certain expenses associated with maintaining and operating the buildings necessary to conduct business, employee expenses, utilities, overhead and other common or shared expenses. Since the Petition Date, the books of the Debtor and Berean Baptist College have been maintained separately and Debtor has not paid any funds towards the discharge of Berean Baptist College. Post-petition and in connection with effectuating a confirmed plan, Berean Baptist Collage has agreed to pay, and has paid, its portion of the shared expenses.

**Effective Date of the Plan**

In accordance with the Plan, the Effective Date of the Plan shall be the first business day arising 30 days following the date upon which the Confirmation Order is no longer subject to appeal or certiorari proceedings, or in the event of an appeal, upon which an order confirming the Confirmation Order becomes final and is no longer subject to further appeal or certiorari proceedings or such other earlier date as the debtor shall designate in a written notice filed with the bankruptcy court.

**Post Confirmation Management**

After confirmation, the Debtor will continue to be managed by Dr. Neal who will continue to draw and receive his salary and benefits, subject to available cash flow. Dr. Neal will receive a gross salary of $3,974.85 per month. Debtor will continue providing health insurance and dental coverage, as well as stipends for housing, utilities, automobiles, phone and fuel expenses in the same manner as that provided prepetition.

**Feasibility of the Plan**

Berean came into this Chapter 11 case with limited funds in hand due to the depletion of working capital because of the reduction in income from church operations and the end of the 2009-2010 school year for the academy (See "Events Leading to Chapter 11 Case," *supra*). During the pendency of this case, Berean has established its ability to maintain all post-petition liabilities. A budget reflecting the anticipated post-confirmation expenditures will be provided upon completion. Projections are being prepared in connection with the development of the plan of reorganization and assume that the terms of the plan will be implemented in accordance with its terms.

Although Berean believes that its assumptions are reasonable in light of the circumstances under which they were made, no assurances can be given that the projections will be realized. Berean urges all creditors and investors to examine carefully the assumptions in evaluating the projections and the Plan, and to consult with their own counsel and tax advisors regarding same.

### Risk Factors

The following is intended as a summary of certain risks associated with the Plan, but it is not exhaustive and must be supplemented by the analysis and evaluation made by each holder of a Claim or Equity Interest of the Plan and this Disclosure Statement as a whole with such holder's own advisors.

### A.     Bankruptcy Risks

### 1.     Insufficient Acceptances

For the Plan to be confirmed, each impaired Class of Claims and Interests is given the opportunity to vote to accept or reject the Plan, except, however, for those Classes which will not receive any distribution under the Plan and which are, therefore, considered to have rejected the Plan. With regard to the impaired Classes which vote on the Plan, the Plan will be deemed accepted by a Class of impaired Claims if the Plan is accepted by holders of Claims of such Class actually voting on the Plan who hold at least two-thirds (2/3) in an amount and more than one-half (½) in number of the total Allowed Claims of such Class. The Plan will be deemed accepted by a Class of impaired Interests if it is accepted by the members actually voting on the Plan who hold at least two-thirds (2/3) in an amount of the total Allowed Interests voted. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.

If any impaired Class of Claims or Interests does not accept the Plan, pursuant to § 1129(b) of the Bankruptcy Code, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, among other things, as to each impaired Class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." The Debtor believes that the Plan affords fair and equitable treatment for all Allowed Claims and Interests. If one or more of the impaired Classes of Claims or Interests votes to reject the Plan, the Debtor may request that the Bankruptcy Court confirm the Plan by application of the "cramdown" procedures available under § 1129(b) of the Bankruptcy Code. However, there can be no assurance that the Debtor will be able to use the cramdown provisions of the Bankruptcy Code for Confirmation of the Plan. Any modification of the Plan necessary to effect a cramdown may result in a different

treatment of Claims and Interests than those currently afforded in the Plan, which, as to any Claim or Interest, may be less favorable, and distributions to holders of Claims and Interests may be delayed.

### 2. **Confirmation Risks**

Any objection to the Plan by a member of a Class of Claims or Interests could either prevent Confirmation of the Plan or delay such Confirmation for a significant period of time.

### 3. **Conditions Precedent**

Confirmation of the Plan and occurrence of the Effective Date are subject to certain conditions precedent that may not occur.  The Debtor, however, is working diligently with all parties in interest to ensure that all conditions precedent are satisfied.

## B. **Economic Risks**

### 1. **Economic Recession**

The Debtor's projected success is based on experience and takes into account normal fluctuations in the economy.  Nonetheless, a prolonged continuation of the current recession could continue to adversely affect the Debtor who relies heavily on income in the form of donations from its members and tuition from academy students. Likewise, the College's ability to share in common expenses is dependent upon tuition and other expenses paid by its students.  Although the Debtor believes that its projections can withstand further economic downturn, the Debtor cannot guarantee that a severe recession or long-term depression will not occur.  In the event of such an occurrence, the Debtor could face difficulties in meeting its financial goals.

## **Preference and Fraudulent Transfer Claims**

Pursuant to § 547 of the Bankruptcy Code, a debtor in possession may avoid as a preference a transfer of property made by the debtor to or for the benefit of a creditor on account of an antecedent debt while the debtor was insolvent, if that creditor received more than it would have received in a liquidation of the debtor under Chapter 7 of the

Bankruptcy Code had the payment not been made and if the payment was made (i) within 90 days before the date that the Bankruptcy Case commenced, or (ii) if the creditor is an "insider" as defined in the Bankruptcy Code, within one year before the commencement of the Bankruptcy Case. A debtor is presumed to have been insolvent during the 90 days preceding the commencement of its Bankruptcy Case. The power to avoid preferences is subject to a number of exceptions set forth in § 547 of the Bankruptcy Code, including one exception applicable to the payment of obligations in the ordinary course of business on ordinary business terms. Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the Bankruptcy Case) for which the transferee was not repaid, such extension constitutes an offset against any otherwise recoverable transfer of property. If a transfer is recovered by the debtor, the transferee obtains a general unsecured claim against the debtor to the extent of the recovery. The Debtor has not yet completed its review of potential preference recoveries.

Pursuant to § 548 of the Bankruptcy Code, a debtor in possession may also avoid a fraudulent transfer of property, including the granting of a security interest in property, made while the debtor was insolvent or which rendered the debtor insolvent, if the debtor received less than reasonably equivalent value in exchange for such property and if the transfer was made within one year before the commencement of the Bankruptcy Case. Pursuant to § 544 of the Bankruptcy Code, a debtor in possession may avoid a transfer of property that is avoidable under applicable non-bankruptcy law. Section 544 of the Bankruptcy Code enables a debtor to apply applicable state laws, including fraudulent conveyance laws, to avoid a transfer of property.

As indicated previously herein, Berean has shared certain expense obligations with its affiliate, Berean Baptist College, Inc. (the "College"). As a result, fraudulent transfer claims could exist with respect to the College. Those claims are, however, mitigated by the College's provision of equipment and payment of other shared expenses. The College is leveraged and is struggling financially itself. The Debtor does not therefore believe the claims against the College are viable and will not be pursued. In order for the Debtor to successfully reorganize and for the College to be successful, the entities need to continue to work together as they have in the past.

Pursuant to § 1123(b)(3) of the Bankruptcy Code, Debtor shall retain and have the exclusive right to enforce against any person or governmental unit any and all causes of action and rights of the Debtor that arose both before and after the Petition Date, including the rights and powers of a trustee and debtor in possession and all causes of action granted pursuant to and still existing under §§ 502, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.

## Federal Tax Consequences

Generally, a holder of a claim that receives a distribution under a plan of reorganization with respect to its claim for interest will recognize ordinary income to the extent it receives cash or property in respect of interest that has not already been included by the holder in income for federal income tax purposes under its method of accounting. If the cash and other property allocable to interest is less than the amount previously included as interest in the holder's federal income tax return, the discharged portion may be deducted in the taxable year in which the Effective Date occurs.

A holder who, under the Plan, receives cash and property in respect of a claim (other than a claim constituting a "security") an amount (other than interest) less than the holder's tax basis in that claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction in some amount under section 166(a) of the Tax Code. The rules governing the timing, amount and character (i.e. ordinary or short-term capital loss) of bad debt deductions, depend in large part on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of claims are therefore urged to consult their own tax advisors regarding the "bad debt" deduction.

No ruling has been requested of the Internal Revenue Service as to any issues referred to or discussed in this section. Berean does not intend to request any such ruling. In the absence of such a ruling, no assurance can be given that any of the anticipated tax results will be achieved. Nothing stated in the discussion which follows is or should be construed as tax advice to any creditor of Berean. CREDITORS SHOULD CONSULT WITH THEIR OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE PLAN.

## Applicability of Federal and Other Securities Laws

Under § 1125 of the Bankruptcy Code, any person that solicits acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, or that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale or purchase of a security offered or sold under the Plan will not be liable, on account of such solicitation or participation, for violation of any applicable law, rule or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase of securities, including federal and state securities laws.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION NOR DOES THE DEBTOR INTEND TO SEEK SUCH APPROVAL.

## Effect of Confirmation

Upon confirmation, Berean's assets will revert from the bankruptcy estate to the reorganized debtor, subject only to the liens and security interests held by Bank of America, GMAC, Wachovia, First Bank and any other secured creditor whose claim is allowed, but free and clear of any and all other liens and encumbrances to secure the payment or repayment of any sum of money or the performance of any obligation.

Payments of, distributions to, and other treatment of the Claims of all creditors provided for in the Plan shall be deemed to be in complete satisfaction, discharge and release of such Claims.   All renewed loans (and recharacterized loans) shall be deemed reinstated and de-accelerated as if there were no defaults and any delinquency therewith shall be deemed void.   Except as provided herein, the rights afforded in the Plan shall be in exchange for and in complete satisfaction, discharge, and release of all Claims of any nature whatsoever, including any interest accrued thereon from and after the Filing Date, against Berean or any of Berean's assets.   Except as otherwise provided in the Plan, all creditors shall be permanently enjoined and precluded from asserting any Claim against Berean or any of Debtor's assets based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Confirmation Date. Confirmation shall not, however, be construed as a release of any rights or obligations under the Plan or as an injunction against any action to enforce any rights or obligations under the Plan, nor shall confirmation of the Plan impact any guaranty of Berean's indebtedness by third parties.

## Alternatives to Confirmation and Consummation of the Plan

The Debtor has evaluated several reorganization alternatives to the Plan, including the continued operation of the Debtor under its current operating and debt structures, sale and relocation and the liquidation of the Debtor.   After studying these alternatives, the Debtor concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, assuming confirmation of the Plan and consummation of the transactions contemplated by the Plan.   The following discussion provides a summary of the Debtor's analysis leading to its conclusion that the Plan will provide the highest value to holders of Claims.

## A.   Continued Operation Under Prepetition Operating and Debt Structure.

Berean determined that it could not continue operating absent reorganization under Chapter 11 of the Bankruptcy Code.   Debtor's secured debt obligations were in

default and foreclosure of the Church property was imminent. Debtor also risked losing leased and financed equipment needed to conduct its business.

Accordingly, the Debtor determined that to continue operation under its existing operating and debt structure, or implementing the needed restructuring outside of chapter 11, would not have remedied the financial problems to which the Debtor was subject.

## B.    Sale Alternative / Relocation.

The Debtor believes that a sale of its property and relocation at this time would be on a distressed basis and would produce no benefit to unsecured creditors, particularly given the current economic situation in Northeast Florida and the Southeast United States. Although the appraised value of the Church Property is in excess of the claim of its secured creditor, First Bank, the Church Property is a "single use" property and there is no real market for a sale of a property this size in the current economic environment. The Debtor therefore believes that the future operations of the Reorganized Debtor operating from the current business location will generate substantially greater consideration for the payment of creditors' claims than the proceeds of any sale of the Debtor's assets in the near future.

Relocating to a new location would require locating suitable space that would enable Debtor to continue with its church and associated ministries as well as the academy and college. The cost of relocating as well as the unknowns regarding where suitable property could be located and the cost of obtaining or leasing new property, makes relocating an unacceptable alternative. In the current real estate market, it is not believed that net proceeds from the sale of the Church property would be in excess of amounts due to First Bank. In light of the above factors, the Debtor concluded that it would be very unlikely that a prospective purchaser of the Debtor's property would emerge that would propose a transaction with a value to creditors greater than that provided by the Plan.

## C.    Liquidation Alternative.

The Debtor also has analyzed whether a Chapter 7 liquidation of the assets of the Debtor would be in the best interest of holders of Claims. That analysis reflects a liquidation value that is materially lower than the value that may be realized through the Plan. The Debtor believes that liquidation would result in substantial diminution in the value to be realized by holders of Claims because of (i) the failure to realize the greater going-concern value of the Debtor's assets; (ii) additional administrative expenses involved in the appointment of a trustee or trustees, attorneys, accountants, and other professionals to assist such trustee(s) in the case of a chapter 7 proceeding; and (iii) the

substantial time which would elapse before creditors would receive any distribution in respect of their Claims.   Were the debtor to liquidate and the Church Property be administered by a Chapter 7 Trustee or turned over or abandoned back to First Bank, Debtor does not believe that the property could be leased or sold in the current market. Consequently, the Debtor believes that the Plan, which provides for the continuation of the Debtor's business, provides substantially greater return to holders of Claims than would liquidation.   A liquidations analysis is set forth below.

## D.    **Alternatives if Plan is Not Confirmed**.

If the Plan is not confirmed, the Debtor or any other party in interest in the Chapter 11 Case could attempt to formulate and propose a different plan or plans of reorganization.   Such plans might involve either a reorganization and continuation of the Debtor's business, a sale of the Debtor's property, an orderly liquidation of the Debtor's assets, or a combination thereof.   Further, if no plan of reorganization can be confirmed, the Chapter 11 Case may be converted to a liquidation proceeding under chapter 7 of the Bankruptcy Code.   In a chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtor.   The proceeds of the liquidation would be distributed to the creditors of the Debtor in accordance with the priorities established by the Bankruptcy Code.

## **Liquidation Analysis**

As indicated above, an alternative to this Plan is liquidation under Chapter 7 of the Bankruptcy Code.   In a Chapter 7 liquidation, a trustee would be appointed to liquidate the debtor's assets.   Although a trustee could obtain permission to operate the business for a limited amount of time, given the nature of the Debtor's business, a trustee could not realistically operate a church and academy and most likely the trustee would be forced to surrender the property to the secured lender, First Bank, who would foreclose its interests in the property and take title to same.[5]

In a forced liquidation, Berean estimates its current receivables would be worth only 10% of face value.   The receivables are generated through academy operations.   If the academy closes and students are forced to find a new school, the likelihood that amounts past due for tuition would be recovered is minimal.   Post-petition academy

---

[5] Any proposed distribution to creditors would also have to provide for the costs and expenses of the liquidation, including statutory compensation to the trustee.   Any remaining funds would be distributed first to administrative claims, then to priority claims and any balance to the unsecured creditors.   The figures set forth herein include estimated liquidation costs.

receivables serve as collateral on Debtor's obligations to First Bank under a stipulated order on the use of cash collateral. The proceeds would therefore not be available to pay to unsecured claims in the event of a liquidation. Likewise, should Debtor be forced to liquidate, tithing and donations to the church would cease. The College would not be in a position to contribute its share of the post-petition common expenses in the event it had to cease operations.

If forced to liquidate its owned automobiles, machinery and office equipment through forced sale, Debtor would likely receive approximately 30% of its book value. The owned assets are subject to the First Bank lien on Debtor's assets and would therefore not be available to unsecured creditors in the event of a liquidation.

Based on the foregoing estimates, the distribution to unsecured creditors would likely be as follows:

| | |
|---|---|
| Cash | $46,732.00[6] |
| Net Proceeds from Equipment Liquidation (Over and above secured debt) | $160,000.00 |
| Preference Recoveries | $0.00 |
| Collection on A/R | $4,226.00[7] |
| Gross Proceeds Available for Distribution | $0.00 |
| Estimated Fees of Trustee, Trustee's Attorney and Accountant | ($10,000.00) |
| Secured claims of First Bank | ($6,100,000.00) |
| Other Administrative Costs | ($1,000.00) |
| Net Proceeds Available for Distribution | $0.00 |
| Amount Available to Unsecured Creditors | $0.00 |

---

[6] Bank balances as of November 30, 2010 from Debtor's November 2010 monthly operating report after consideration of outstanding checks.

[7] Estimated net recovery. Receivables as of November 30, 2010 total $42,267. Accounts receivable are pledged as collateral to First Bank.

BEREAN BELIEVES THAT THE PLAN AS NEGOTIATED AND PROPOSED PROVIDES THE GREATEST AND EARLIEST POSSIBLE DISTRIBUTIONS TO CREDITORS AND INTEREST HOLDERS OF BEREAN. BEREAN THEREFORE BELIEVES THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTEREST OF EACH CLASS OF CREDITORS AND INTEREST HOLDERS OF BEREAN AND RECOMMENDS THAT THEY VOTE TO ACCEPT THE PLAN.

### Disclaimers

The statements contained in this Disclosure Statement are made as of the date hereof, unless otherwise stated.  Neither delivery of the Disclosure Statement nor any exchange of rights made in connection with Plan shall create an implication that there has been no change of facts since the date hereof.

DATED:   December 30, 2010

**STUTSMAN THAMES & MARKEY, P.A.**

*/s/ Bradley R. Markey*

By _____
    Bradley R. Markey

Florida Bar Number 0984213
50 North Laura Street, Suite 1600
Jacksonville, Florida   32202
(904) 358-4000
(904) 358-4001 (Facsimile)
brm@stmlaw.net

Attorneys for Berean Baptist Church of Orange Park, Inc.

6